1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11

KEVIN HEUER,

No. C 09-05331 CRB

12

Plaintiff,

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

13

v.

14

CITY AND COUNTY OF SAN
FRANCISCO, ET AL.,

15
16

Defendants.

_____/

17
18          Plaintiff Kevin Heuer, a Sergeant in the San Francisco Sheriff's Department, has sued

19   the City and County of San Francisco and Sheriff Michael Hennessey (collectively,

20   "Defendants") because he was passed over for a promotion to the rank of Lieutenant in 2008.

     Plaintiff alleges that Sheriff Hennessey failed to promote him, not based upon merit, but as
21
     retaliation for Plaintiff's political activity, union activity, and protected speech.  Defendants
22
     have articulated a legitimate, nondiscriminatory reason for not promoting Plaintiff, and
23
     Plaintiff has not demonstrated that Defendants' reason is a pretext.  Accordingly, as
24
     explained below, the Court GRANTS Defendants' Motion for Summary Judgment (dkt. 24).
25

26   **I.       BACKGROUND**

27          **1.       Early Employment and Union History**

28   Plaintiff was hired as a Deputy Sheriff with the San Francisco Sheriff's Department in

**United States District Court**
For the Northern District of California

1   August 1999.  Hennessey Decl. ¶ 2.  Plaintiff joined his union, the San Francisco Deputy

2   Sheriff's Association ("SFDSA" or "DSA"), and became shop steward in 2000.  Heuer

3   Depo. at 25:17.  In 2002 or 2003, he became Parliamentarian for the DSA.  Id. at 25:15-19.[1]

4   In 2005, Plaintiff passed both segments of the Senior Deputy civil service examination, and

5   Sheriff Hennessey promoted him to that rank.  Hennessey Decl. ¶ 2.  Sheriff Hennessey

6   again promoted him, to the position of Sergeant, in July 2006.  Id. ¶ 3.

7       In his capacity as Parliamentarian for the DSA, Plaintiff was attending an October

8   2007 DSA meeting when Chief Arata[2] came in and accused the union's board members,

9   including Plaintiff, of falsely denying having received documents relating to lawsuits

10  between him and DSA.  Heuer Depo. at 30:17-32:11; Hennessey Decl. Ex. C.  Plaintiff

11  recounts that he said, "'Chief Arata, as the Parliamentarian, I have neither physical office,

12  mail box or address at this facility.  Do you include me, personally, when you call the Board

13  liars?'  To which he responded in the affirmative."  Heuer Depo. at 32:18-22.

14      Plaintiff wrote a letter to Sheriff Hennessey, relating the incident and expressing his

15  desire "to file a formal complaint."  See Hennessey Decl. Ex. C.  The Letter states in part:

16  "On Wednesday, October 10, 2007, during the [SFDSA] general body meeting, Chief

17  Deputy Arata engaged in an unprofessional attack on my character, casting aspersion on my

18  reputation when he accused me of being a liar.  His slanderous accusation was delivered

19  aloud, with repetition, to me personally. . . ."  Id.  The letter characterized the "slur" as

20  "character assassination" and stated "I remain highly offended by this slur" and "this slur is

21  an attack on my honesty."  Id.  It described both the "subsequent damage to my reputation"

22  and "the immediate health damage caused to me."  Id.  It then listed specific department

23  policies Plaintiff believed that Arata's conduct violated, and requested an investigation.  Id.

24

25

26      [1] In 2010, the SFDSA restructured its membership so that deputies with the rank of Sergeant and
    above were no longer members of the DSA, but a separate MSA, or Managers and Supervisors
27  Association.  Opp'n (dkt. 25) at 1 n.1.

28      [2] This was prior to the split of SFDSA, and Chief Arata was a member of the union.  See Heuer
    Decl. at 34:16-23.

2

United States District Court
For the Northern District of California

1    Sheriff Hennessey responded to Plaintiff's letter by listing numerous facts supporting

2    his conclusion that "you were both off-duty and off-site" and that the "incident involved

3    Union business, not SFSD operation agendas."  Hennessey Decl. Ex. D.  The letter

4    concluded, "this matter is exclusively within the confines of Union business" and "[a]s such,

5    it is not appropriate for me to interfere with the official business of the bargaining unit."  Id.

6    Plaintiff later testified that he agreed with Sheriff Hennessey that the incident involved Union

7    business, and not the Sheriff Department operation agendas.  Heuer Depo. at 40:15-19.

8    Plaintiff did not have any discussion with Sheriff Hennessey about this matter after receiving

9    his letter and believed that "this closed the door on it."  Id. at 40:24-41:1.

10          **2.    The Wong Campaign**

11    Sheriff Hennessey has held his position since 1980, and prevailed in eight consecutive

12    elections.  Hennessey Decl. ¶¶ 1, 22.  Plaintiff opposed Sheriff Hennessey's reelection in

13    November 2007, when union President Dave Wong ran as a challenger.  Heuer Depo. at 53:

14    4-10.  Plaintiff wrote and revised some of Wong's campaign materials.  Heuer Decl. ¶ 3;

15    Wong Decl. ¶ 5.  He also attended two events with Wong: an event at the Democratic Central

16    Committee, at which Wong and Plaintiff sat on one side of the auditorium and Sheriff

17    Hennessey sat on the other, and an event put on by the Harvey Milk Democratic Party, at

18    which Wong and Plaintiff sat together in plain view of Sheriff Hennessey.  Heuer Decl. ¶¶ 4-

19    8. Wong Decl. ¶¶ 6-10.  At both events, Sheriff Hennessey acknowledged Plaintiff's

20    presence.[3]  Heuer Decl. ¶¶ 7, 9; Wong Decl. ¶¶ 9, 11.

21          Plaintiff never had any discussion with Sheriff Hennessey about the written materials

22    Plaintiff drafted for Wong, or any of the underlying substantive issues, but believes that "it

23    would be obvious to the Sheriff what was written by [Wong] and what was written by

24    [Plaintiff]."  Heuer Depo. at 56:1-22.  For his part, Sheriff Hennessey states in his

25    declaration: "I am aware that Sergeant Heuer worked with Deputy Wong on his campaign,

26    but have no real knowledge of what that involved."  Hennessey Decl. ¶ 22.

27    _____

28          [3] Wong states that "[t]he Sheriff reacted with visible surprise when he saw [Plaintiff] with [Wong]."  Wong Decl. ¶ 11.  This statement does not square well with Plaintiff's other allegations that Sheriff Hennessey knew long before that point that Plaintiff was working on the Wong campaign.

1   Dave Wong received a small fraction of the vote, and Sheriff Hennessey was

2   reelected.  Hennessey Decl. ¶ 22.

3       **3.     Domestic Problems**

4       The backdrop to Plaintiff's work for the Sheriff's Department, with the union, and on

5   Wong's campaign at this time is an extremely volatile domestic life.  Strangely, Plaintiff

6   hardly mentions this situation at all in his Opposition brief, referencing just briefly Sheriff

7   Hennessey's "concerns about [Plaintiff] which arose out of [Plaintiff's] relationship with his

8   partner."  Opp'n at 5.  Plaintiff's relationship with his partner was no small matter.

9       Sheriff Hennessey states in his declaration that "[a]t various times, the Department has

10  learned – either through Sergeant Heuer, his domestic partner, other Department members or

11  third parties – of Sergeant Heuer's involvement in violent or potentially violent disputes with

12  his domestic partner, Todd Leichliter."  Hennessey Decl. ¶ 6.  The relationship yielded a

13  number of serious domestic disputes, including one in June 2008, just before Plaintiff's

14  promotional interview with Sheriff Hennessey.  Heuer Depo. at 70:6-72: 16.  On June 26,

15  2008, the Sheriff's office issued a Formal Notice of Investigation relating to allegations that

16  Plaintiff called Leichliter and demanded that he return home, prompting Leichliter to tell his

17  therapist that he was scared and afraid to file a report.  See Hecimovich Decl. Ex. F.

18  Leichliter further told his therapist that Plaintiff had threatened him with a gun.  Heuer Depo.

19  at 70:10-12.  Plaintiff testified later that on the occasion when he demanded that Leichliter

20  return home, he had learned that Leichliter had stolen money from him.  Id. at 74:8-75:23.

21      Although Leichliter apparently recanted the part of his account relating to the gun, in

22  doing so he explained that he was using cocaine.  Id. at 70:18-22.  Plaintiff also testified that

23  he put Leichliter into a drug treatment center in Sonoma, believed that it had worked, but that

24  Leichliter subsequently began using methamphetamine.  Id. at 71:5-22.  Plaintiff stated that

25  he put Leichliter in two treatment programs before realizing, "[t]he treatment is not making

26  headway."  Id. at 81:8-12.

27      The relationship was also violent.  Plaintiff testified that "When Todd would, I later

28  realized, be under the influence, he would be violent and attack me."  Id. at 76:1-2.  He

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

1  described having a member of the Sheriff's Department peer support team come to his

2  apartment to speak with Leichliter, and telling Leichliter that he had to leave.  Id. at 76:3-9.

3  Leichliter left, but, following participation in an outpatient program, Plaintiff allowed

4  Leichliter to move back in with him.  Id. at 76:10-21.  Over the course of the relationship,

5  Leichliter "threatened [Plaintiff] on many occasions," "made allegations that [Plaintiff]

6  threatened him," and "made a lot of threats about making complaints" to the Sheriff's

7  Department.  Id. at 77:12-22.  Plaintiff also stated that "There were instances where Todd –

8  there was one instance where Todd called the police, and then told them, I'm making it up, or

9  whatever he said to them."  Id. at 80:21-24.

10       Plaintiff himself raised the issue of the June 2008 incident in his promotional

11  interview.  Id. at 72:17-20.[4]  Sheriff Hennessey states in his declaration that, in the interview:

12      14. . . . we discussed his ongoing problems with Mr. Leichliter and their effect on

    Sergeant Heuer's role in the Department as he sought to take on managerial

13      responsibilities.  I was aware of some of the facts surrounding the June 2008 incident.

    . . and additionally knew that Undersheriff Dempsey had met with Leichliter to

14      discuss his allegations. . . . It was clear that Mr. Leichliter had been living with

    Sergeant Heuer while actively procuring and using cocaine and/or methamphetamines.

15      15. During the promotional interview, Sergeant Heuer acknowledged the significance

    of his problems with Leichliter to his effectiveness as a leader in the Department.  He

16      acknowledged that, in addition to the most recent episode of mental and emotional

    problems, Leichliter had a history of drug abuse, and that Sergeant Heuer had

17      misjudged whether the drug use had stopped.

18  Hennessey Decl. ¶¶ 14-15.  Plaintiff does not dispute this account.

19      **4.    Non-Promotion**

20      The promotion Plaintiff sought in this case was to the position of Lieutenant.  The

21  Sheriff's Department maintains a written job description for the position of Sheriff's

22  Lieutenant, and Sheriff Hennessey maintains a document entitled What I Expect of

23  Supervisors, that lists attributes he finds important, including "Leading by Example."

24  See Hennessey Decl. Exs. A, B.

25

26

27      [4] Also in that interview, Plaintiff spoke of his qualifications for the promotion, including his

three years as a background investigator, that he had experience working as an Acting Watch

28  Commander, as well as having performed a variety of assignments and a number of auxiliary duties.

Id. at 15:11-23:4.

5

Based on the civil service exam, Plaintiff was the fourteenth candidate from the top, one of three candidates ranked ninth. Hecimovich Decl. Ex. J. On August 22, 2008, Sheriff Hennessey promoted seventeenth candidates for promotion. Hennesey Decl. ¶ 9. Id. The lowest rank of candidates promoted was fifteenth. Id. Plaintiff was passed over, along with three other candidates (ranked seventh, thirteenth, and fifteenth). Id. ¶ 11. Sheriff Hennessey asserts that to his knowledge, none of the other passed-over candidates held an office in the union, accused any officer of misconduct, or participated in any election against the Sheriff. Id.

Sheriff Hennessey states in his declaration that "I concluded that [Plaintiff] was less qualified than one or more of the competing candidates. This determination was based on the relative qualifications of the other deputies being considered, on Sergeant Heuer's poor judgment in dealing with issues relating to Mr. Leichliter as those issues impacted his role with the Department, and on prior instances of poor judgment as a supervisor, including ongoing issues of anger management." Id. ¶ 10.

Sheriff Hennessey further declares that of the deputies promoted from positions below Plaintiff, none had received discipline of any sort, and only one, "a sergeant passed over in August 2008 but subsequently promoted based on improved performance, was the subject of a disciplinary action, the allegations of which were not sustained." Id. ¶ 12. Plaintiff disagrees, asserting, "[T]hrough my work at the union and otherwise, I am aware that others who were promoted on the list were the subject of investigations within the Department." Heuer Decl. ¶ 20.[5] Sheriff Hennessey asserts without contradiction that none had demonstrated anger management problems, violent behavior, or conduct that might bring discredit to the Sheriff's Department. Hennessey Decl. ¶ 12. Sheriff Hennessey adds that "During his tenure with the Department, Sergeant Heuer has been involved in a number of disputes with other members of the Department. While none of these incidents resulted in

---

[5] Defendants object to this paragraph of Plaintiff's deposition, asserting that it lacks foundation and is hearsay. Reply at 2 n.1. The Court will accept Plaintiff's version – that others were investigated, if not disciplined – as he is the non-moving party.

United States District Court
For the Northern District of California

1    formal discipline, one common theme I observed was Sergeant Heuer's difficulty controlling

2    his temper."  Hennessey Decl. ¶ 5.[6]

3        In August 2008, following his non-promotion, Plaintiff initiated a meeting with

4    Sheriff Hennessey.  Hennessey Decl. ¶ 16.  Sheriff Hennessey did not share his reasons for

5    not promoting Plaintiff, but told him simply that "he was not the best choice among the

6    candidates he was stacked up against."  Id.  Sheriff Hennessey alleges that Plaintiff "became

7    visibly upset, yelled at me and stormed out of the office."  Id.  Plaintiff denies yelling at this

8    meeting, see Heuer Decl. ¶ 22, and the Court accepts Plaintiff's account.

9        The August 2008 eligible list was extended to August 2011, and Sheriff Hennessey

10   selected other candidates over Plaintiff.  Hennessey Decl. ¶ 17.  Sheriff Hennessey stated that

11   in the interim, he learned of additional information about Plaintiff's poor handling of

12   conflicts with Leichliter: "I was apprised that [Plaintiff] accused Leichliter of felony assault

13   on his person, had to drive to the Rio Vista Police Department for emergency medical

14   treatment following an assault, and that Leichliter was booked and charged with five

15   felonies."  Hennessey Decl. ¶ 17.  Plaintiff described this incident, which took place in May

16   2010, as Leichliter acting erratically, not sleeping, and eventually attacking him, opening a

17   six inch gash on his head.  Heuer Depo. at 79:19-80:5.  Plaintiff insisted, "the most I do is

18   defend myself."  Id. at 79:23-24.  Having been beaten severely by Leichliter, and because

19   Leichliter had destroyed the phones in the house, Plaintiff drove to the Rio Vista Police

20   Department to file a complaint.  Id. at 80:6-10.

21       Sheriff Hennessey stated about the incident: "I was told that [Plaintiff] afterward

22   professed that he had resolved, once and for all, that Leichliter was a negative force in his life

23   and that he would not allow him to return.  More recently, during the final rounds of

24   promotional interviews, [Plaintiff] informed Undersheriff Dempsey that Leichliter had been

25   released from a drug clinic and moved back in with [Plaintiff]."  Hennessey Decl. ¶ 17.

26

27       ─────────────
28       [6] The declaration filed by Defendants cuts off in the middle of paragraph 5, apparently omitting
     mention of Sheriff Hennessey suggesting that Plaintiff attend anger management classes.  Compare Mot.
     at 3 (citing Hennessey Decl. ¶ 5 as mentioning this issue) with Hennessey Decl. ¶ 5 (ending mid-
     sentence).

*United States District Court*
*For the Northern District of California*

7

United States District Court
For the Northern District of California

1    Plaintiff brought suit in state court in October 2009, alleging violation of (1) the

2    Public Safety Officers' Procedural Bill of Rights by Prohibiting the Lawful Engagement in

3    Political Activity, (2) the Meyers-Milias-Brown Act and Interference with Lawful Union

4    Activity by Denying Plaintiff a Promotion for the Exercise of Lawful Actions as a

5    Representative of an Employee Bargaining Unit, and (3) Plaintiff's First Amendment and

6    Fourteenth Amendment Right to Free Speech.  See generally Compl. (dkt. 1 Ex. B).

7    Defendants removed the case to this Court in November 2009, and now move for summary

8    judgment.  See dkts.1, 24.

9    **II.     LEGAL STANDARD**

10    Summary judgment is proper when "the movant shows that there is no genuine

11    dispute as to any material fact and the movant is entitled to a judgment as a matter of law."

12    Fed. R. Civ. P. 56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on

13    which a reasonable fact finder could find for the nonmoving party, and a dispute is

14    "material" only if it could affect the outcome of the suit under governing law.  See Anderson

15    v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A principal purpose of the summary

16    judgment procedure "is to isolate and dispose of factually unsupported claims."  Celotex

17    Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "Where the record taken as a whole could not

18    lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

19    trial.'"  Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

20    **III.    DISCUSSION**

21    Defendants move for summary judgment on Plaintiff's three causes of action: (1)

22    retaliation based on political activity, (2) retaliation based on union activity; and (3)

23    retaliation based on protected speech.  See generally Mot. (dkt. 24).

24    //

25    //

26    //

27    //

28    //

8

United States District Court
For the Northern District of California

1    **1.     Retaliation Based on Political Activity**

2        Plaintiff's first cause of action, for retaliation based on political activity, is brought

3    under the Public Safety Officers' Procedural Bill of Rights.[7]  Compl. (dkt. 1 Ex. B at 5).

4    Plaintiff alleges that Sheriff Hennessey did not promote him to Lieutenant "because of his

5    political activities in openly and actively supporting Defendant Hennessey's competitor in

6    the race for San Francisco Sheriff."  Id. ¶ 22.  The parties agreed at the motion hearing that

7    this claim should be analyzed like a Title VII claim.

8        In order to prevail on a Title VII disparate treatment claim, a plaintiff must first

9    establish a prima facie case of discrimination.  In particular, a plaintiff must show that (1) he

10   belongs to a protected class, (2) he was performing competently, (3) he was subjected to an

11   adverse employment action, and (4) he was similarly situated to individuals outside the

12   protected class who were treated more favorably.  See Aragon v. Republic Silver State

13   Disposal Co., 292 F.3d 654, 658 (9th Cir. 2002).  If a plaintiff succeeds in establishing a

14   prima facie case, the burden shifts to the defendant to articulate a legitimate,

15   nondiscriminatory reason for the adverse employment action.  Id. (citing McDonnell Douglas

16   Corp. v. Green, 411 U.S. 792, 802 (1973)).  If the defendant does so, the plaintiff must

17   demonstrate that the defendant's articulated reason is a pretext for unlawful discrimination

18   "by either [1] directly persuading the court that a discriminatory reason more likely

19   motivated the employer or [2] indirectly by showing that the employer's proffered

20   explanation is unworthy of credence."  Id. at 658-59 (internal quotation marks and citations

21   omitted).  To establish pretext, "very little" direct evidence of discriminatory motive is

22   required, but if circumstantial evidence is offered, such evidence has to be "specific" and

23   "substantial" to create a triable issue.  Godwin v. Hunt Wesson Inc., 150 F.3d 1217, 1222

24   (9th Cir. 1998); Little v. Windermere Relocation, Inc., 301 F.3d 958, 971 (9th Cir. 2002).

25       Here, Defendants do not dispute that (or even discuss whether) Plaintiff has

26   established a prima facie case of discrimination.  Instead they argue that they have articulated

27

28       [7] Gov't Code § 3302(a) provides, "Except as otherwise provided by law, or whenever on duty or in uniform, no public safety officer shall be prohibited from engaging, or be coerced or required to engage, in political activity."

a legitimate, nondiscriminatory reason for not promoting him, and that Plaintiff has no

evidence of pretext.  Mot. at 2.  The Court agrees.

Sheriff Hennessey's articulated reason for not promoting Plaintiff is two-fold:

"[Plaintiff's] poor judgment in dealing with issues relating to Mr. Leichliter as those issues

impacted his role with the Department," as well as "prior instances of poor judgment as a

supervisor, including ongoing issues of anger management."  Hennessey Decl. ¶ 10.  The

reason relating to anger management is not substantiated by the evidence, beyond Sheriff

Hennessey's general assertion that he "observed . . . [Plaintiff's] difficulty controlling his

temper."  Id. ¶ 5; see also footnote six herein.  In contrast to that statement is evidence that

Plaintiff received "exceeds expectations" reviews on his two evaluations prior to the

promotional decision; his 2009 evaluation even states that he "remains calm during the most

extreme situations."  Cullinane-Smith Decl. Ex. 4 at 5 of 59.  The reason relating to Mr.

Leichliter finds much more support in the record, however, and appears both legitimate and

nondiscriminatory: the relationship was violent, chaotic, and reflected poorly on Plaintiff's

judgment[8] and therefore on the Department.[9]  See Dible v. City of Chandler, 515 F.3d 918,

928 (9th Cir. 2008) ("[plaintiff's] activities, when known to the public, would be 'detrimental

to the mission and functions of the employer' . . . .  The public expects officers to behave with

a high level of propriety, and, unsurprisingly, is outraged when they do not do so.").  Plaintiff

even conceded in his deposition that the Department considers off-duty conduct if it is

unbecoming to a Deputy, as well as off-duty conduct that reflects adversely on the

Department.  Heuer Depo. at 81:24-82:5.  And he volunteered that friends of his in the

---

[8] The Court does not suggest that all victims of domestic abuse should be criticized for their judgment in maintaining relationships with their abusers.  The Court addresses only the evidence relating to this Plaintiff, and notes that this Plaintiff does not defend his judgment in connection with Mr. Leichliter, instead relying on having demonstrated pretext.

[9] Plaintiff's argument that "Defendants admit that issues arising out of disciplinary investigations are not considered during appointments," Opp'n at 5 (citing Cullinane-Smith Decl. Ex. 6, Def's Response to Special Interrogatories, Set One, Response 5), is a red herring.  Although the Department does not consider "the fact that an investigation has occurred," Plaintiff points to no evidence that the Department may not consider the underlying charges, or any information relating to the subject matter of an investigation, in order to assess a deputy's qualifications.  See Reply (dkt. 29) at 1.

United States District Court
For the Northern District of California

1   Department have suggested to him that "you know: Look, Kevin, it can't be good for you

2   that he, you know made these accusations." Id. at 82:15-18.

3       Because Defendants articulated a legitimate, nondiscriminatory reason for the

4   nonpromotion, Plaintiff must demonstrate that Defendants' articulated reason is a pretext for

5   unlawful discrimination.  Again, if circumstantial evidence is offered, such evidence must be

6   both "specific" and "substantial."  Godwin, 150 F.3d at 1222.  Plaintiff's evidence of pretext

7   on this claim consists of the following.

8       First, Plaintiff points to his removal from the uniform committee as evidence that

9   Sheriff Hennessey resented his involvement in Wong's campaign.  Heuer Depo. at 56:23-3.

10  This argument is weak, however, as Plaintiff himself testified of a legitimate reason for that

11  removal: Undersheriff Dempsey came to the uniform committee to present a new patch

12  designed by her domestic partner, Plaintiff was "very vocal in the rejection of that patch," the

13  union "became extremely active in fighting that," and a "battle" ensued "that lasted several

14  months."  Id. at 59:10-60:25.  This is not substantial evidence of pretext.

15      Second, Plaintiff described a frosty relationship between Sheriff Hennessey and Dave

16  Wong after the election.  See id. at 50:25-51:5 ("It got to the – things got so bad, [Hennessey]

17  got to the point [that he] didn't speak to the Union President," Dave Wong).  Wong also states

18  that after the election but while he was still President of the SFDSA, Sheriff Hennessey

19  avoided him and the relationship between the SFDSA and the Sheriff's office "were nearly

20  nonexistent."  Wong Decl. ¶ 16.  But as Defendants point out, Mot. at 11, "personality

21  conflicts at work" and "snubbing by supervisors and co-workers are not actionable."

22  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation

23  marks omitted); see also Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998)

24  (Title VII is not "a general civility code for the American workplace").  Moreover, Plaintiff's

25  testimony was that the relationship strain with Wong started around the time of the lawsuit

26  about female and male duty roles at jail, not because of Wong's political activity.  Heuer

27  Depo. at 52:10-12.  This is also not substantial evidence of pretext.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Third, and most compelling, Plaintiff asserts that "[f]rom the time of his candidacy

2    forward, Wong and his supporters were subject to increased investigations and discipline

3    while those who supported the Sheriff were promoted (in one case, even after a felony

4    arrest). Opp'n at 10. Although Plaintiff testified that he was not aware of Wong having been

5    eligible for promotion, or of any personnel action having been taken against Wong, or of

6    Wong being investigated for any charge of misconduct, see Heuer Depo. at 52:13-24,[10]

7    Wong claims otherwise.[11] Wong declares that he was never disciplined until he ran for

8    Sheriff, but that following the election, he and his supporters were the subjects of "numerous

9    investigations." Wong Decl. ¶ 13. He claims that he knows "of at least three other

10   [unnamed] Deputies who openly supported my campaign whom have been subjected to

11   investigations or discipline which was harsher than that given to Deputies whom were not

12   my supporters." Id. ¶ 14. He gives the example of deputies who did not support Wong's

13   candidacy (although he provides no names) as having not been terminated "despite having

14   beaten a prisoner until he required hospitalization." Id. Wong further asserts that since the

15   election he "was personally a target of the administration and ultimately was terminated from

16   [his] position." Id. ¶ 15. He says that he is "personally aware of at least [two] other deputies

17   whom engaged in acts more severe than those [he has] been accused of and whom where not

18   terminated." Id.

19       Defendants object to paragraphs 11 through 16 and 21 (that is, all of the paragraphs

20   cited above) of Wong's declaration as lacking foundation, containing hearsay and

21   inadmissible opinion testimony. Reply at 2 n.1. Indeed, the Court cannot accept Wong's

22   characterization of what happened to his supporters, whom he claims were mistreated (or his

23   characterization of those who did not support his candidacy, whom he claims received

24

25       [10] Plaintiff's deposition was on September 2, 2010.

26       [11] Wong's declaration was prepared on September 22, 2011. Although the discrepancy between
     Plaintiff's account and Wong's account might be partly attributable to the year that elapsed between the
27   two (and to Wong's greater knowledge of his own employment), it does strike the Court as odd that
     Plaintiff was unaware of any disciplinary action against Wong from the November 2007 election
28   through September 2010, and Wong asserts that following the election, he and his supporters were the
     subjects of "numerous investigations." See Wong Decl. ¶ 13.

United States District Court
For the Northern District of California

1    favorable treatment) because he provides absolutely no foundation for, or details of, his

2    assertions.  See, e.g., Cecala v. Newman, 532 F. Supp. 2d 1118, 1152 (D. Ariz. 2007)

3    (finding that testimony that lacked factual and temporal foundation and asserted

4    unsubstantiated conclusions rather than hard evidence did not create a triable issue); Express,

5    LLC v. Fetish Group, Inc., 464 F. Supp. 2d 965, 977 (C.D. Cal. 2006) ("Because Express'

6    only evidence on the issue is a declaration that lacks an adequate foundation and is not based

7    on the personal knowledge of the declarant, no triable issue of material fact has been

8    raised.").

9           In addition, Defendants argue that Plaintiff "presents no evidence from which it could

10   be inferred that Wong's termination was wrongful or that other deputies engaged in improper

11   actions 'more severe than those I have been accused of.'"  Reply at 9.  That is true.  The Court

12   has no information about Wong's termination; Wong's statement only supports an inference

13   that Wong believes that he was wrongly terminated.  But Wong's conclusory, subjective

14   belief that he was wrongly terminated cannot alone defeat the Defendants' Motion.  See, e.g.,

15   Marks v. U.S., 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by

16   factual data will not create a triable issue of fact."); Gelin v. Geithner, No. 06-CV-10176,

17   2009 WL 804144, at *23 n.15 (S.D. N.Y. March 26, 2009) (collecting cases where courts

18   refused to find an inference of discrimination based on affidavits of other employees

19   consisting of conclusory allegations and personal opinions).  Because Wong's declaration as

20   it relates to Plaintiff presents only circumstantial evidence,[12] it must be both "specific" and

21   "substantial" enough to establish pretext.  See Godwin v. Hunt Wesson Inc., 150 F.3d 1217,

22   1222 (9th Cir. 1998).  Although it presents some evidence that the otherwise legitimate

23   reason proffered – Heuer's poor judgment relating to Leichliter – was pretext, it does not

24   provide substantial evidence of pretext.

25

26

27            [12] See Coghlan v. American Seafoods Co., LLC, 413 F.3d 1090, 1095 (9th Cir. 2005) (describing
     direct evidence in such cases as "clearly sexist, racist, or similarly discriminatory statements or actions
28   by the employer" and circumstantial evidence as evidence "that requires an additional inferential step
     to demonstrate discrimination.").

United States District Court
For the Northern District of California

1    Accordingly, Plaintiff has failed to rebut Defendants' legitimate, nondiscriminatory

2    reason, and the Court grants Defendants' Motion as to the political activity claim.

3    **2.    Retaliation Based on Union Activity**

4    Plaintiff's second cause of action, for retaliation based on union activity, is based on

5    the Meyers-Milias-Brown Act.[13]  See Compl. (dkt. 1 Ex. B at 5-6).  Plaintiff alleges that he is

6    "a recognized representative of the SFDSA, an employee bargaining unit," and that Sheriff

7    Hennessey "did not appoint plaintiff as a lieutenant because of plaintiff's exercise of lawful

8    action as a recognized representative of SFDSA and because of plaintiff's other lawful union

9    activities."  Compl. (dkt. 1 Ex. B) ¶¶ 28-29.  As with his political retaliation claim, there is

10   little authority interpreting the Act that Plaintiff alleges was violated, but see Ramirez v.

11   Eckert, No. B193324, 2007 WL 2258045, at *3 (Cal. App. 2007) ("The MMBA expressly

12   provides that a public employee shall not be denied a promotion for the exercise of a lawful

13   action as an employee bargaining unit representative."), but the parties agreed at the motion

14   hearing that it should be analyzed like a Title VII claim.

15   Defendants argue again that Sheriff Hennessey based his promotion decision on

16   "legitimate performance criteria" and that Plaintiff has not demonstrated that such criteria

17   was a pretext.  Mot. at 11.  Plaintiff's evidence of pretext relating to his union activity is

18   neither significant not substantial.  Importantly, Sheriff Hennessey promoted Plaintiff twice

19   while he was in the union.  See Hennessey Decl. ¶¶ 2, 3, 18.  In Bradley v. Harcourt, Brace

20   & Co., 104 F.3d 267, 270-71 (9th Cir. 1996), the Ninth Circuit held that "where the same

21   actor is responsible for both the hiring and firing of a discrimination plaintiff, and both

22   actions occur within a short period of time, a strong inference arises that there was no

23   discriminatory action."  The "same actor" inference has also been applied where the same

24   actor had not hired but promoted the plaintiff.  See Coghlan, 413 F.3d at 1096.  Here, having

25   promoted Plaintiff twice while Plaintiff was in the union, it makes little sense that Sheriff

26   Hennessey would then decide not to promote Plaintiff because of his involvement in the

27

28       [13] Gov't Code § 3502.1 provides, "No public employee shall be subject to punitive action or denied promotion, or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."

United States District Court
For the Northern District of California

1   union.  This is so even considering that Plaintiff had risen in the ranks at the union, as he was

2   already Parliamentarian when he was last promoted, in 2005.  Heuer Depo. at 25:15-19;

3   Hennessey Decl. ¶ 2.[14]

4           In addition, Sheriff Hennessey states in his declaration that he has "promoted well

5   over a dozen deputies while they held leadership positions of one sort of another in the

6   DSA," including two former DSA Presidents.  Hennessey Decl. ¶ 19.  Plaintiff also testified

7   that prior to being passed over for promotion, Sheriff Hennessey had never done anything to

8   him that he attributed to his involvement in the union.  Heuer Depo. at 52:25-53:3.  And he

9   testified that he does not currently hold a position with the MSA; when counsel asked him if

10  that was "out of any concern that holding a position with them would have any negative

11  impact on [his employment]," he said no.  Id. at 30:1-6.

12          To the extent that Plaintiff relies on his support of Wong's candidacy in order to

13  substantiate his union retaliation claim, see Opp'n at 10, that allegation is not part of the

14  claim as pled in the Complaint, see Compl. ¶¶ 29-30, and is more properly the subject of his

15  political activity claim, discussed above.

16          Accordingly, the Court grants Defendants' Motion as to the union activity claim.

17  **3.        Retaliation Based on Protected Speech**

18          Finally, Plaintiff attributes his non-promotion to retaliation based on the exercise of

19  free speech.  See Compl. (dkt.1 Ex. B) ¶¶ 32-34.  The Complaint frames this cause of action

20  as follows:

21      VIOLATION OF PLAINTIFF'S FIRST AMENDMENT AND FOURTEENTH
        AMENDMENT RIGHT TO FREE SPEECH
22      32.    Plaintiff re-alleges and incorporates paragraphs 1 through 31 as though set
               forth at length in this cause of action.
23      33.    Plaintiff has a First Amendment right of free speech to comment on matters of
               public concern. As such, plaintiff had the right to ask Chief Arata at a meeting
24             of the SFDSA, if Chief Arata was accusing plaintiff of lying about receiving
               mailings related to a Federal Lawsuit.  After Chief Arata answered that he was
25             accusing plaintiff of lying, plaintiff likewise had a First Amendment right to
               make a formal complaint to Defendant Hennessey, asking for an investigation.
26

27  _____

28      [14] The same actor inference does not operate to bar the political retaliation claim, because
    Plaintiff's involvement in the Wong campaign took place after the 2005 promotion and before the
    August 2008 failure to promote, and, according to Plaintiff, created animus.  See Opp'n at 10 n. 5.

15

34.     Defendant Hennessey, acting in the course and scope of his employment as San Francisco Sheriff, failed to promote plaintiff to the position of lieutenant because of plaintiff's exercise of his rights to free speech.

Id.

Defendants move for summary judgment on this cause of action, arguing chiefly that Plaintiff's letter did not constitute protected speech. Mot. at 12-13. They accurately assert that "[t]o present a cognizable free speech retaliation claim, [Plaintiff] must show that he engaged in speech involving a matter of public concern." Mot. at 13 (citing Reddish v. City of Tacoma, 123 F.3d 1216, 1223 (9th Cir. 1997)). And they point to the letter's emphasis on Plaintiff himself – for example, its references to "my character," "my reputation," "character assassination," and "an attack on my honesty" – as evidence that the letter does not involve a matter of public concern. See id.; Hennessey Decl. Ex. C.[15] The Court agrees.

"When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Where the speech at issue "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo," and only "reflect[s] one employee's dissatisfaction," that speech is not a matter of public concern. Id. at 148. Further, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004).

---

[15] Importantly, Plaintiff argues that Defendants misconstrue his cause of action, and maintains that it was not merely intended to challenge retaliation for his letter to Sheriff Hennessey about Arata, but also retaliation for his political activity and union membership. Opp'n (dkt. 25) at 10-11. He asks that, if the Court does not read the Complaint that way, he be permitted leave to amend. Id. at 11. Despite the boilerplate language in the First Amendment cause of action incorporating the preceding paragraphs, the Court does not find that that cause of action can fairly be read to involve any conduct other than Plaintiff's letter about Arata. See Hennessey Decl. Ex. C. Moreover, the Court concludes that it is too late at this stage of the litigation to amend the Complaint.

16

**United States District Court**
For the Northern District of California

1   Plaintiff's letter did not address a topic of "general interest" and "value and concern to

2   the public." See id.  It focused not on any broader societal harm, but on damage Plaintiff's

3   own reputation and health from being called a liar.  See Hennessey Decl. Ex. C.  It is

4   therefore a classic "internal workplace grievance," as in Golt v. City of Los Angeles, 214

5   Fed. Appx. 708, 712 (9th Cir. 2006) (internal quotation marks omitted), where the speech at

6   issue "did not inform the public about any aspect of the [government body's] functioning or

7   operation."  Although the letter referenced department policy that Arata's speech allegedly

8   violated, see Hennessey Decl. Ex. C, the context of the letter demonstrates that it was not an

9   effort to inform the public of anything, but an effort to seek redress for a perceived personal

10  affront.  See also Heuer Depo. at 38:15-17 ("My aim was that I believed, and still believe,

11  that Chief Arata owed me an apology.").  That is not a matter of public concern.  Nor is

12  Plaintiff's attempt to characterize the letter as relating to Arata's "slandering the entire Board

13  of the employee's union" and relating to "the competency of public officials," Opp'n at 12,

14  borne out by the content of the letter, see Hennessey Decl. Ex. C.  Indeed, the main case

15  upon which Plaintiff relies, McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983),

16  holds that "speech [which] deals with individual personnel disputes and grievances . . . of no

17  relevance to the public's evaluation of the performance of governmental agencies" is not a

18  matter of public concern.

19  The letter did not address a matter of public concern, and so the Court's inquiry on

20  this cause of action need go no further.  See Johnson v. Poway Utd. Sch. Dist., 658 F.3d 954,

21  961-62 (9th Cir. 2011) (internal quotation marks omitted) (Plaintiff's failure to satisfy any of

22  sequential steps "necessarily concludes" court's inquiry on this subject).  The Court need not

23  engage in the Pickering balancing test.  See id.; Dible, 515 F.3d at 926-27.[16]  Accordingly the

24  Court grants Defendants' Motion as to Plaintiff's First Amendment claim.

25  //

26  //

27

28      [16]  A separate test applies where a plaintiff's activities were unrelated to his public employment,
    see id. at 927, but neither side argues that it applies here.

17

IV.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**


Dated: November 14, 2011

                                CHARLES  R. BREYER
                                UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California