IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN HEUER,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, ET AL.,<br><br>    Defendants.<br>_____/ | No. C 09-05331 CRB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

    Plaintiff Kevin Heuer, a Sergeant in the San Francisco Sheriff's Department, has sued the City and County of San Francisco and Sheriff Michael Hennessey (collectively, "Defendants") because he was passed over for a promotion to the rank of Lieutenant in 2008. Plaintiff alleges that Sheriff Hennessey failed to promote him, not based upon merit, but as retaliation for Plaintiff's political activity, union activity, and protected speech. Defendants have articulated a legitimate, nondiscriminatory reason for not promoting Plaintiff, and Plaintiff has not demonstrated that Defendants' reason is a pretext. Accordingly, as explained below, the Court GRANTS Defendants' Motion for Summary Judgment (dkt. 24).

**I.     BACKGROUND**

    **1.     Early Employment and Union History**

Plaintiff was hired as a Deputy Sheriff with the San Francisco Sheriff's Department in

August 1999. Hennessey Decl. ¶ 2. Plaintiff joined his union, the San Francisco Deputy Sheriff's Association ("SFDSA" or "DSA"), and became shop steward in 2000. Heuer Depo. at 25:17. In 2002 or 2003, he became Parliamentarian for the DSA. Id. at 25:15-19.[1] In 2005, Plaintiff passed both segments of the Senior Deputy civil service examination, and Sheriff Hennessey promoted him to that rank. Hennessey Decl. ¶ 2. Sheriff Hennessey again promoted him, to the position of Sergeant, in July 2006. Id. ¶ 3.

In his capacity as Parliamentarian for the DSA, Plaintiff was attending an October 2007 DSA meeting when Chief Arata[2] came in and accused the union's board members, including Plaintiff, of falsely denying having received documents relating to lawsuits between him and DSA. Heuer Depo. at 30:17-32:11; Hennessey Decl. Ex. C. Plaintiff recounts that he said, "'Chief Arata, as the Parliamentarian, I have neither physical office, mail box or address at this facility. Do you include me, personally, when you call the Board liars?' To which he responded in the affirmative." Heuer Depo. at 32:18-22.

Plaintiff wrote a letter to Sheriff Hennessey, relating the incident and expressing his desire "to file a formal complaint." See Hennessey Decl. Ex. C. The Letter states in part: "On Wednesday, October 10, 2007, during the [SFDSA] general body meeting, Chief Deputy Arata engaged in an unprofessional attack on my character, casting aspersion on my reputation when he accused me of being a liar. His slanderous accusation was delivered aloud, with repetition, to me personally. . . ." Id. The letter characterized the "slur" as "character assassination" and stated "I remain highly offended by this slur" and "this slur is an attack on my honesty." Id. It described both the "subsequent damage to my reputation" and "the immediate health damage caused to me." Id. It then listed specific department policies Plaintiff believed that Arata's conduct violated, and requested an investigation. Id.

---

[1] In 2010, the SFDSA restructured its membership so that deputies with the rank of Sergeant and above were no longer members of the DSA, but a separate MSA, or Managers and Supervisors Association. Opp'n (dkt. 25) at 1 n.1.

[2] This was prior to the split of SFDSA, and Chief Arata was a member of the union. See Heuer Decl. at 34:16-23.

2

Sheriff Hennessey responded to Plaintiff's letter by listing numerous facts supporting his conclusion that "you were both off-duty and off-site" and that the "incident involved Union business, not SFSD operation agendas." Hennessey Decl. Ex. D. The letter concluded, "this matter is exclusively within the confines of Union business" and "[a]s such, it is not appropriate for me to interfere with the official business of the bargaining unit." Id. Plaintiff later testified that he agreed with Sheriff Hennessey that the incident involved Union business, and not the Sheriff Department operation agendas. Heuer Depo. at 40:15-19. Plaintiff did not have any discussion with Sheriff Hennessey about this matter after receiving his letter and believed that "this closed the door on it." Id. at 40:24-41:1.

### 2. The Wong Campaign

Sheriff Hennessey has held his position since 1980, and prevailed in eight consecutive elections. Hennessey Decl. ¶¶ 1, 22. Plaintiff opposed Sheriff Hennessey's reelection in November 2007, when union President Dave Wong ran as a challenger. Heuer Depo. at 53:4-10. Plaintiff wrote and revised some of Wong's campaign materials. Heuer Decl. ¶ 3; Wong Decl. ¶ 5. He also attended two events with Wong: an event at the Democratic Central Committee, at which Wong and Plaintiff sat on one side of the auditorium and Sheriff Hennessey sat on the other, and an event put on by the Harvey Milk Democratic Party, at which Wong and Plaintiff sat together in plain view of Sheriff Hennessey. Heuer Decl. ¶¶ 4-8. Wong Decl. ¶¶ 6-10. At both events, Sheriff Hennessey acknowledged Plaintiff's presence.[3] Heuer Decl. ¶¶ 7, 9; Wong Decl. ¶¶ 9, 11.

Plaintiff never had any discussion with Sheriff Hennessey about the written materials Plaintiff drafted for Wong, or any of the underlying substantive issues, but believes that "it would be obvious to the Sheriff what was written by [Wong] and what was written by [Plaintiff]." Heuer Depo. at 56:1-22. For his part, Sheriff Hennessey states in his declaration: "I am aware that Sergeant Heuer worked with Deputy Wong on his campaign, but have no real knowledge of what that involved." Hennessey Decl. ¶ 22.

---

[3] Wong states that "[t]he Sheriff reacted with visible surprise when he saw [Plaintiff] with [Wong]." Wong Decl. ¶ 11. This statement does not square well with Plaintiff's other allegations that Sheriff Hennessey knew long before that point that Plaintiff was working on the Wong campaign.

3

Dave Wong received a small fraction of the vote, and Sheriff Hennessey was reelected. Hennessey Decl. ¶ 22.

### 3. Domestic Problems

The backdrop to Plaintiff's work for the Sheriff's Department, with the union, and on Wong's campaign at this time is an extremely volatile domestic life. Strangely, Plaintiff hardly mentions this situation at all in his Opposition brief, referencing just briefly Sheriff Hennessey's "concerns about [Plaintiff] which arose out of [Plaintiff's] relationship with his partner." Opp'n at 5. Plaintiff's relationship with his partner was no small matter.

Sheriff Hennessey states in his declaration that "[a]t various times, the Department has learned – either through Sergeant Heuer, his domestic partner, other Department members or third parties – of Sergeant Heuer's involvement in violent or potentially violent disputes with his domestic partner, Todd Leichliter." Hennessey Decl. ¶ 6. The relationship yielded a number of serious domestic disputes, including one in June 2008, just before Plaintiff's promotional interview with Sheriff Hennessey. Heuer Depo. at 70:6-72: 16. On June 26, 2008, the Sheriff's office issued a Formal Notice of Investigation relating to allegations that Plaintiff called Leichliter and demanded that he return home, prompting Leichliter to tell his therapist that he was scared and afraid to file a report. See Hecimovich Decl. Ex. F. Leichliter further told his therapist that Plaintiff had threatened him with a gun. Heuer Depo. at 70:10-12. Plaintiff testified later that on the occasion when he demanded that Leichliter return home, he had learned that Leichliter had stolen money from him. Id. at 74:8-75:23.

Although Leichliter apparently recanted the part of his account relating to the gun, in doing so he explained that he was using cocaine. Id. at 70:18-22. Plaintiff also testified that he put Leichliter into a drug treatment center in Sonoma, believed that it had worked, but that Leichliter subsequently began using methamphetamine. Id. at 71:5-22. Plaintiff stated that he put Leichliter in two treatment programs before realizing, "[t]he treatment is not making headway." Id. at 81:8-12.

The relationship was also violent. Plaintiff testified that "When Todd would, I later realized, be under the influence, he would be violent and attack me." Id. at 76:1-2. He

described having a member of the Sheriff's Department peer support team come to his apartment to speak with Leichliter, and telling Leichliter that he had to leave. Id, at 76:3-9. Leichliter left, but, following participation in an outpatient program, Plaintiff allowed Leichliter to move back in with him. Id. at 76:10-21. Over the course of the relationship, Leichliter "threatened [Plaintiff] on many occasions," "made allegations that [Plaintiff] threatened him," and "made a lot of threats about making complaints" to the Sheriff's Department. Id. at 77:12-22. Plaintiff also stated that "There were instances where Todd – there was one instance where Todd called the police, and then told them, I'm making it up, or whatever he said to them." Id. at 80:21-24.

Plaintiff himself raised the issue of the June 2008 incident in his promotional interview. Id. at 72:17-20.[4] Sheriff Hennessey states in his declaration that, in the interview:

> 14. . . . we discussed his ongoing problems with Mr. Leichliter and their effect on Sergeant Heuer's role in the Department as he sought to take on managerial responsibilities. I was aware of some of the facts surrounding the June 2008 incident. . . and additionally knew that Undersheriff Dempsey had met with Leichliter to discuss his allegations. . . . It was clear that Mr. Leichliter had been living with Sergeant Heuer while actively procuring and using cocaine and/or methamphetamines.
> 15. During the promotional interview, Sergeant Heuer acknowledged the significance of his problems with Leichliter to his effectiveness as a leader in the Department. He acknowledged that, in addition to the most recent episode of mental and emotional problems, Leichliter had a history of drug abuse, and that Sergeant Heuer had misjudged whether the drug use had stopped.

Hennessey Decl. ¶¶ 14-15. Plaintiff does not dispute this account.

**4.     Non-Promotion**

The promotion Plaintiff sought in this case was to the position of Lieutenant. The Sheriff's Department maintains a written job description for the position of Sheriff's Lieutenant, and Sheriff Hennessey maintains a document entitled What I Expect of Supervisors, that lists attributes he finds important, including "Leading by Example." See Hennessey Decl. Exs. A, B.

---

[4] Also in that interview, Plaintiff spoke of his qualifications for the promotion, including his three years as a background investigator, that he had experience working as an Acting Watch Commander, as well as having performed a variety of assignments and a number of auxiliary duties. Id. at 15:11-23:4.

5

1    Based on the civil service exam, Plaintiff was the fourteenth candidate from the top,
2 one of three candidates ranked ninth. Hecimovich Decl. Ex. J. On August 22, 2008, Sheriff
3 Hennessey promoted seventeenth candidates for promotion. Hennesey Decl. ¶ 9. Id. The
4 lowest rank of candidates promoted was fifteenth. Id. Plaintiff was passed over, along with
5 three other candidates (ranked seventh, thirteenth, and fifteenth). Id. ¶ 11. Sheriff
6 Hennessey asserts that to his knowledge, none of the other passed-over candidates held an
7 office in the union, accused any officer of misconduct, or participated in any election against
8 the Sheriff. Id.

9    Sheriff Hennessey states in his declaration that "I concluded that [Plaintiff] was less
10 qualified than one or more of the competing candidates. This determination was based on the
11 relative qualifications of the other deputies being considered, on Sergeant Heuer's poor
12 judgment in dealing with issues relating to Mr. Leichliter as those issues impacted his role
13 with the Department, and on prior instances of poor judgment as a supervisor, including
14 ongoing issues of anger management." Id. ¶ 10.

15    Sheriff Hennessey further declares that of the deputies promoted from positions below
16 Plaintiff, none had received discipline of any sort, and only one, "a sergeant passed over in
17 August 2008 but subsequently promoted based on improved performance, was the subject of
18 a disciplinary action, the allegations of which were not sustained." Id. ¶ 12. Plaintiff
19 disagrees, asserting, "[T]hrough my work at the union and otherwise, I am aware that others
20 who were promoted on the list were the subject of investigations within the Department."
21 Heuer Decl. ¶ 20.[5] Sheriff Hennessey asserts without contradiction that none had
22 demonstrated anger management problems, violent behavior, or conduct that might bring
23 discredit to the Sheriff's Department. Hennessey Decl. ¶ 12. Sheriff Hennessey adds that
24 "During his tenure with the Department, Sergeant Heuer has been involved in a number of
25 disputes with other members of the Department. While none of these incidents resulted in

---

[5] Defendants object to this paragraph of Plaintiff's deposition, asserting that it lacks foundation and is hearsay. Reply at 2 n.1. The Court will accept Plaintiff's version – that others were investigated, if not disciplined – as he is the non-moving party.

6

1 formal discipline, one common theme I observed was Sergeant Heuer's difficulty controlling
2 his temper." Hennessey Decl. ¶ 5.[6]

In August 2008, following his non-promotion, Plaintiff initiated a meeting with Sheriff Hennessey. Hennessey Decl. ¶ 16. Sheriff Hennessey did not share his reasons for not promoting Plaintiff, but told him simply that "he was not the best choice among the candidates he was stacked up against." Id. Sheriff Hennessey alleges that Plaintiff "became visibly upset, yelled at me and stormed out of the office." Id. Plaintiff denies yelling at this meeting, see Heuer Decl. ¶ 22, and the Court accepts Plaintiff's account.

The August 2008 eligible list was extended to August 2011, and Sheriff Hennessey selected other candidates over Plaintiff. Hennessey Decl. ¶ 17. Sheriff Hennessey stated that in the interim, he learned of additional information about Plaintiff's poor handling of conflicts with Leichliter: "I was apprised that [Plaintiff] accused Leichliter of felony assault on his person, had to drive to the Rio Vista Police Department for emergency medical treatment following an assault, and that Leichliter was booked and charged with five felonies." Hennessey Decl. ¶ 17. Plaintiff described this incident, which took place in May 2010, as Leichliter acting erratically, not sleeping, and eventually attacking him, opening a six inch gash on his head. Heuer Depo. at 79:19-80:5. Plaintiff insisted, "the most I do is defend myself." Id. at 79:23-24. Having been beaten severely by Leichliter, and because Leichliter had destroyed the phones in the house, Plaintiff drove to the Rio Vista Police Department to file a complaint. Id. at 80:6-10.

Sheriff Hennessey stated about the incident: "I was told that [Plaintiff] afterward professed that he had resolved, once and for all, that Leichliter was a negative force in his life and that he would not allow him to return. More recently, during the final rounds of promotional interviews, [Plaintiff] informed Undersheriff Dempsey that Leichliter had been released from a drug clinic and moved back in with [Plaintiff]." Hennessey Decl. ¶ 17.

---

[6] The declaration filed by Defendants cuts off in the middle of paragraph 5, apparently omitting mention of Sheriff Hennessey suggesting that Plaintiff attend anger management classes. Compare Mot. at 3 (citing Hennessey Decl. ¶ 5 as mentioning this issue) with Hennessey Decl. ¶ 5 (ending mid-sentence).

7

1    Plaintiff brought suit in state court in October 2009, alleging violation of (1) the
Public Safety Officers' Procedural Bill of Rights by Prohibiting the Lawful Engagement in
Political Activity, (2) the Meyers-Milias-Brown Act and Interference with Lawful Union
Activity by Denying Plaintiff a Promotion for the Exercise of Lawful Actions as a
Representative of an Employee Bargaining Unit, and (3) Plaintiff's First Amendment and
Fourteenth Amendment Right to Free Speech. See generally Compl. (dkt. 1 Ex. B).
Defendants removed the case to this Court in November 2009, and now move for summary
judgment. See dkts.1, 24.

## II.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendants move for summary judgment on Plaintiff's three causes of action: (1) retaliation based on political activity, (2) retaliation based on union activity; and (3) retaliation based on protected speech. See generally Mot. (dkt. 24).

//
//
//
//
//

8

**1.     Retaliation Based on Political Activity**

Plaintiff's first cause of action, for retaliation based on political activity, is brought under the Public Safety Officers' Procedural Bill of Rights.[7] Compl. (dkt. 1 Ex. B at 5). Plaintiff alleges that Sheriff Hennessey did not promote him to Lieutenant "because of his political activities in openly and actively supporting Defendant Hennessey's competitor in the race for San Francisco Sheriff." Id. ¶ 22. The parties agreed at the motion hearing that this claim should be analyzed like a Title VII claim.

In order to prevail on a Title VII disparate treatment claim, a plaintiff must first establish a prima facie case of discrimination. In particular, a plaintiff must show that (1) he belongs to a protected class, (2) he was performing competently, (3) he was subjected to an adverse employment action, and (4) he was similarly situated to individuals outside the protected class who were treated more favorably. See Aragon v. Republic Silver State Disposal Co., 292 F.3d 654, 658 (9th Cir. 2002). If a plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If the defendant does so, the plaintiff must demonstrate that the defendant's articulated reason is a pretext for unlawful discrimination "by either [1] directly persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 658-59 (internal quotation marks and citations omitted). To establish pretext, "very little" direct evidence of discriminatory motive is required, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial" to create a triable issue. Godwin v. Hunt Wesson Inc., 150 F.3d 1217, 1222 (9th Cir. 1998); Little v. Windermere Relocation, Inc., 301 F.3d 958, 971 (9th Cir. 2002).

Here, Defendants do not dispute that (or even discuss whether) Plaintiff has established a prima facie case of discrimination. Instead they argue that they have articulated

---

[7] Gov't Code § 3302(a) provides, "Except as otherwise provided by law, or whenever on duty or in uniform, no public safety officer shall be prohibited from engaging, or be coerced or required to engage, in political activity."

9

a legitimate, nondiscriminatory reason for not promoting him, and that Plaintiff has no evidence of pretext. Mot. at 2. The Court agrees.

Sheriff Hennessey's articulated reason for not promoting Plaintiff is two-fold: "[Plaintiff's] poor judgment in dealing with issues relating to Mr. Leichliter as those issues impacted his role with the Department," as well as "prior instances of poor judgment as a supervisor, including ongoing issues of anger management." Hennessey Decl. ¶ 10. The reason relating to anger management is not substantiated by the evidence, beyond Sheriff Hennessey's general assertion that he "observed . . . [Plaintiff's] difficulty controlling his temper." Id. ¶ 5; see also footnote six herein. In contrast to that statement is evidence that Plaintiff received "exceeds expectations" reviews on his two evaluations prior to the promotional decision; his 2009 evaluation even states that he "remains calm during the most extreme situations." Cullinane-Smith Decl. Ex. 4 at 5 of 59. The reason relating to Mr. Leichliter finds much more support in the record, however, and appears both legitimate and nondiscriminatory: the relationship was violent, chaotic, and reflected poorly on Plaintiff's judgment[8] and therefore on the Department.[9] See Dible v. City of Chandler, 515 F.3d 918, 928 (9th Cir. 2008) ("[plaintiff's] activities, when known to the public, would be 'detrimental to the mission and functions of the employer' . . . . The public expects officers to behave with a high level of propriety, and, unsurprisingly, is outraged when they do not do so."). Plaintiff even conceded in his deposition that the Department considers off-duty conduct if it is unbecoming to a Deputy, as well as off-duty conduct that reflects adversely on the Department. Heuer Depo. at 81:24-82:5. And he volunteered that friends of his in the

---

[8] The Court does not suggest that all victims of domestic abuse should be criticized for their judgment in maintaining relationships with their abusers. The Court addresses only the evidence relating to this Plaintiff, and notes that this Plaintiff does not defend his judgment in connection with Mr. Leichliter, instead relying on having demonstrated pretext.

[9] Plaintiff's argument that "Defendants admit that issues arising out of disciplinary investigations are not considered during appointments," Opp'n at 5 (citing Cullinane-Smith Decl. Ex. 6, Def's Response to Special Interrogatories, Set One, Response 5), is a red herring. Although the Department does not consider "the fact that an investigation has occurred," Plaintiff points to no evidence that the Department may not consider the underlying charges, or any information relating to the subject matter of an investigation, in order to assess a deputy's qualifications. See Reply (dkt. 29) at 1.

10

1 Department have suggested to him that "you know: Look, Kevin, it can't be good for you
2 that he, you know made these accusations." Id. at 82:15-18.

3 　　　Because Defendants articulated a legitimate, nondiscriminatory reason for the
4 nonpromotion, Plaintiff must demonstrate that Defendants' articulated reason is a pretext for
5 unlawful discrimination. Again, if circumstantial evidence is offered, such evidence must be
6 both "specific" and "substantial." Godwin, 150 F.3d at 1222. Plaintiff's evidence of pretext
7 on this claim consists of the following.

8 　　　First, Plaintiff points to his removal from the uniform committee as evidence that
9 Sheriff Hennessey resented his involvement in Wong's campaign. Heuer Depo. at 56:23-3.
10 This argument is weak, however, as Plaintiff himself testified of a legitimate reason for that
11 removal: Undersheriff Dempsey came to the uniform committee to present a new patch
12 designed by her domestic partner, Plaintiff was "very vocal in the rejection of that patch," the
13 union "became extremely active in fighting that," and a "battle" ensued "that lasted several
14 months." Id. at 59:10-60:25. This is not substantial evidence of pretext.

15 　　　Second, Plaintiff described a frosty relationship between Sheriff Hennessey and Dave
16 Wong after the election. See id. at 50:25-51:5 ("It got to the – things got so bad, [Hennessey]
17 got to the point [that he] didn't speak to the Union President," Dave Wong). Wong also states
18 that after the election but while he was still President of the SFDSA, Sheriff Hennessey
19 avoided him and the relationship between the SFDSA and the Sheriff's office "were nearly
20 nonexistent." Wong Decl. ¶ 16. But as Defendants point out, Mot. at 11, "personality
21 conflicts at work" and "snubbing by supervisors and co-workers are not actionable."
22 Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation
23 marks omitted); see also Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998)
24 (Title VII is not "a general civility code for the American workplace"). Moreover, Plaintiff's
25 testimony was that the relationship strain with Wong started around the time of the lawsuit
26 about female and male duty roles at jail, not because of Wong's political activity. Heuer
27 Depo. at 52:10-12. This is also not substantial evidence of pretext.

28

1    Third, and most compelling, Plaintiff asserts that "[f]rom the time of his candidacy
2  forward, Wong and his supporters were subject to increased investigations and discipline
3  while those who supported the Sheriff were promoted (in one case, even after a felony
4  arrest). Opp'n at 10. Although Plaintiff testified that he was not aware of Wong having been
5  eligible for promotion, or of any personnel action having been taken against Wong, or of
6  Wong being investigated for any charge of misconduct, see Heuer Depo. at 52:13-24,[10]
7  Wong claims otherwise.[11] Wong declares that he was never disciplined until he ran for
8  Sheriff, but that following the election, he and his supporters were the subjects of "numerous
9  investigations." Wong Decl. ¶ 13. He claims that he knows "of at least three other
10 [unnamed] Deputies who openly supported my campaign whom have been subjected to
11 investigations or discipline which was harsher than that given to Deputies whom were not
12 my supporters." Id. ¶ 14. He gives the example of deputies who did not support Wong's
13 candidacy (although he provides no names) as having not been terminated "despite having
14 beaten a prisoner until he required hospitalization." Id. Wong further asserts that since the
15 election he "was personally a target of the administration and ultimately was terminated from
16 [his] position." Id. ¶ 15. He says that he is "personally aware of at least [two] other deputies
17 whom engaged in acts more severe than those [he has] been accused of and whom where not
18 terminated." Id.

19    Defendants object to paragraphs 11 through 16 and 21 (that is, all of the paragraphs
20 cited above) of Wong's declaration as lacking foundation, containing hearsay and
21 inadmissible opinion testimony. Reply at 2 n.1. Indeed, the Court cannot accept Wong's
22 characterization of what happened to his supporters, whom he claims were mistreated (or his
23 characterization of those who did not support his candidacy, whom he claims received

---

[10] Plaintiff's deposition was on September 2, 2010.

[11] Wong's declaration was prepared on September 22, 2011. Although the discrepancy between Plaintiff's account and Wong's account might be partly attributable to the year that elapsed between the two (and to Wong's greater knowledge of his own employment), it does strike the Court as odd that Plaintiff was unaware of any disciplinary action against Wong from the November 2007 election through September 2010, and Wong asserts that following the election, he and his supporters were the subjects of "numerous investigations." See Wong Decl. ¶ 13.

12

favorable treatment) because he provides absolutely no foundation for, or details of, his assertions. See, e.g., Cecala v. Newman, 532 F. Supp. 2d 1118, 1152 (D. Ariz. 2007) (finding that testimony that lacked factual and temporal foundation and asserted unsubstantiated conclusions rather than hard evidence did not create a triable issue); Express, LLC v. Fetish Group, Inc., 464 F. Supp. 2d 965, 977 (C.D. Cal. 2006) ("Because Express' only evidence on the issue is a declaration that lacks an adequate foundation and is not based on the personal knowledge of the declarant, no triable issue of material fact has been raised.").

In addition, Defendants argue that Plaintiff "presents no evidence from which it could be inferred that Wong's termination was wrongful or that other deputies engaged in improper actions 'more severe than those I have been accused of.'" Reply at 9. That is true. The Court has no information about Wong's termination; Wong's statement only supports an inference that Wong believes that he was wrongly terminated. But Wong's conclusory, subjective belief that he was wrongly terminated cannot alone defeat the Defendants' Motion. See, e.g., Marks v. U.S., 578 F.2d 261, 263 (9th Cir. 1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact."); Gelin v. Geithner, No. 06-CV-10176, 2009 WL 804144, at *23 n.15 (S.D. N.Y. March 26, 2009) (collecting cases where courts refused to find an inference of discrimination based on affidavits of other employees consisting of conclusory allegations and personal opinions). Because Wong's declaration as it relates to Plaintiff presents only circumstantial evidence,[12] it must be both "specific" and "substantial" enough to establish pretext. See Godwin v. Hunt Wesson Inc., 150 F.3d 1217, 1222 (9th Cir. 1998). Although it presents some evidence that the otherwise legitimate reason proffered – Heuer's poor judgment relating to Leichliter – was pretext, it does not provide substantial evidence of pretext.

---

[12] See Coghlan v. American Seafoods Co., LLC, 413 F.3d 1090, 1095 (9th Cir. 2005) (describing direct evidence in such cases as "clearly sexist, racist, or similarly discriminatory statements or actions by the employer" and circumstantial evidence as evidence "that requires an additional inferential step to demonstrate discrimination.").

13

Accordingly, Plaintiff has failed to rebut Defendants' legitimate, nondiscriminatory reason, and the Court grants Defendants' Motion as to the political activity claim.

### 2. Retaliation Based on Union Activity

Plaintiff's second cause of action, for retaliation based on union activity, is based on the Meyers-Milias-Brown Act.[13] See Compl. (dkt. 1 Ex. B at 5-6). Plaintiff alleges that he is "a recognized representative of the SFDSA, an employee bargaining unit," and that Sheriff Hennessey "did not appoint plaintiff as a lieutenant because of plaintiff's exercise of lawful action as a recognized representative of SFDSA and because of plaintiff's other lawful union activities." Compl. (dkt. 1 Ex. B) ¶¶ 28-29. As with his political retaliation claim, there is little authority interpreting the Act that Plaintiff alleges was violated, but see Ramirez v. Eckert, No. B193324, 2007 WL 2258045, at *3 (Cal. App. 2007) ("The MMBA expressly provides that a public employee shall not be denied a promotion for the exercise of a lawful action as an employee bargaining unit representative."), but the parties agreed at the motion hearing that it should be analyzed like a Title VII claim.

Defendants argue again that Sheriff Hennessey based his promotion decision on "legitimate performance criteria" and that Plaintiff has not demonstrated that such criteria was a pretext. Mot. at 11. Plaintiff's evidence of pretext relating to his union activity is neither significant not substantial. Importantly, Sheriff Hennessey promoted Plaintiff twice while he was in the union. See Hennessey Decl. ¶¶ 2, 3, 18. In Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir. 1996), the Ninth Circuit held that "where the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." The "same actor" inference has also been applied where the same actor had not hired but promoted the plaintiff. See Coghlan, 413 F.3d at 1096. Here, having promoted Plaintiff twice while Plaintiff was in the union, it makes little sense that Sheriff Hennessey would then decide not to promote Plaintiff because of his involvement in the

---

[13] Gov't Code § 3502.1 provides, "No public employee shall be subject to punitive action or denied promotion, or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."

14

union. This is so even considering that Plaintiff had risen in the ranks at the union, as he was already Parliamentarian when he was last promoted, in 2005. Heuer Depo. at 25:15-19; Hennessey Decl. ¶ 2.[14]

In addition, Sheriff Hennessey states in his declaration that he has "promoted well over a dozen deputies while they held leadership positions of one sort of another in the DSA," including two former DSA Presidents. Hennessey Decl. ¶ 19. Plaintiff also testified that prior to being passed over for promotion, Sheriff Hennessey had never done anything to him that he attributed to his involvement in the union. Heuer Depo. at 52:25-53:3. And he testified that he does not currently hold a position with the MSA; when counsel asked him if that was "out of any concern that holding a position with them would have any negative impact on [his employment]," he said no. Id. at 30:1-6.

To the extent that Plaintiff relies on his support of Wong's candidacy in order to substantiate his union retaliation claim, see Opp'n at 10, that allegation is not part of the claim as pled in the Complaint, see Compl. ¶¶ 29-30, and is more properly the subject of his political activity claim, discussed above.

Accordingly, the Court grants Defendants' Motion as to the union activity claim.

### 3.     Retaliation Based on Protected Speech

Finally, Plaintiff attributes his non-promotion to retaliation based on the exercise of free speech. See Compl. (dkt.1 Ex. B) ¶¶ 32-34. The Complaint frames this cause of action as follows:

> VIOLATION OF PLAINTIFF'S FIRST AMENDMENT AND FOURTEENTH AMENDMENT RIGHT TO FREE SPEECH
> 32.   Plaintiff re-alleges and incorporates paragraphs 1 through 31 as though set forth at length in this cause of action.
> 33.   Plaintiff has a First Amendment right of free speech to comment on matters of public concern. As such, plaintiff had the right to ask Chief Arata at a meeting of the SFDSA, if Chief Arata was accusing plaintiff of lying about receiving mailings related to a Federal Lawsuit. After Chief Arata answered that he was accusing plaintiff of lying, plaintiff likewise had a First Amendment right to make a formal complaint to Defendant Hennessey, asking for an investigation.

---

[14] The same actor inference does not operate to bar the political retaliation claim, because Plaintiff's involvement in the Wong campaign took place after the 2005 promotion and before the August 2008 failure to promote, and, according to Plaintiff, created animus. See Opp'n at 10 n. 5.

15

> 34. Defendant Hennessey, acting in the course and scope of his employment as San Francisco Sheriff, failed to promote plaintiff to the position of lieutenant because of plaintiff's exercise of his rights to free speech.

Id.

Defendants move for summary judgment on this cause of action, arguing chiefly that Plaintiff's letter did not constitute protected speech. Mot. at 12-13. They accurately assert that "[t]o present a cognizable free speech retaliation claim, [Plaintiff] must show that he engaged in speech involving a matter of public concern." Mot. at 13 (citing Reddish v. City of Tacoma, 123 F.3d 1216, 1223 (9th Cir. 1997)). And they point to the letter's emphasis on Plaintiff himself – for example, its references to "my character," "my reputation," "character assassination," and "an attack on my honesty" – as evidence that the letter does not involve a matter of public concern. See id.; Hennessey Decl. Ex. C.[15] The Court agrees.

"When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147 (1983). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Where the speech at issue "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo," and only "reflect[s] one employee's dissatisfaction," that speech is not a matter of public concern. Id. at 148. Further, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004).

---

[15] Importantly, Plaintiff argues that Defendants misconstrue his cause of action, and maintains that it was not merely intended to challenge retaliation for his letter to Sheriff Hennessey about Arata, but also retaliation for his political activity and union membership. Opp'n (dkt. 25) at 10-11. He asks that, if the Court does not read the Complaint that way, he be permitted leave to amend. Id. at 11. Despite the boilerplate language in the First Amendment cause of action incorporating the preceding paragraphs, the Court does not find that that cause of action can fairly be read to involve any conduct other than Plaintiff's letter about Arata. See Hennessey Decl. Ex. C. Moreover, the Court concludes that it is too late at this stage of the litigation to amend the Complaint.

16

Plaintiff's letter did not address a topic of "general interest" and "value and concern to the public." See id. It focused not on any broader societal harm, but on damage Plaintiff's own reputation and health from being called a liar. See Hennessey Decl. Ex. C. It is therefore a classic "internal workplace grievance," as in Golt v. City of Los Angeles, 214 Fed. Appx. 708, 712 (9th Cir. 2006) (internal quotation marks omitted), where the speech at issue "did not inform the public about any aspect of the [government body's] functioning or operation." Although the letter referenced department policy that Arata's speech allegedly violated, see Hennessey Decl. Ex. C, the context of the letter demonstrates that it was not an effort to inform the public of anything, but an effort to seek redress for a perceived personal affront. See also Heuer Depo. at 38:15-17 ("My aim was that I believed, and still believe, that Chief Arata owed me an apology."). That is not a matter of public concern. Nor is Plaintiff's attempt to characterize the letter as relating to Arata's "slandering the entire Board of the employee's union" and relating to "the competency of public officials," Opp'n at 12, borne out by the content of the letter, see Hennessey Decl. Ex. C. Indeed, the main case upon which Plaintiff relies, McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983), holds that "speech [which] deals with individual personnel disputes and grievances . . . of no relevance to the public's evaluation of the performance of governmental agencies" is not a matter of public concern.

The letter did not address a matter of public concern, and so the Court's inquiry on this cause of action need go no further. See Johnson v. Poway Utd. Sch. Dist., 658 F.3d 954, 961-62 (9th Cir. 2011) (internal quotation marks omitted) (Plaintiff's failure to satisfy any of sequential steps "necessarily concludes" court's inquiry on this subject). The Court need not engage in the Pickering balancing test. See id.; Dible, 515 F.3d at 926-27.[16] Accordingly the Court grants Defendants' Motion as to Plaintiff's First Amendment claim.

//

//

---

[16] A separate test applies where a plaintiff's activities were unrelated to his public employment, see id. at 927, but neither side argues that it applies here.

17

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: November 14, 2011

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE